FILED
2013 May-08  PM 12:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **V. NOEL HOPKINS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:12-cv-00518-AKK** |
| **ADT SECURITY SERVICES** | ) | |
| **INC and JOHN DWIGHT** | ) | |
| **SPENCE,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

V. Noel Hopkins brings this action against his former employer ADT

Security Services, Inc. ("ADT") and supervisor John Dwight Spence ("Spence") for

breach of contract, fraud, and Family Medical Leave Act ("FMLA") interference

and retaliation stemming from his July 2010 discharge.  Doc. 1.  ADT and Spence

(collectively, "Defendants") seek summary judgment on all claims.  Doc. 20.  The

motion is fully briefed and ripe for review.  Docs. 21, 25-26.  For the reasons stated

more fully below, the court **GRANTS** the motion.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiffs' favor when sufficient competent evidence supports

2

Plaintiffs' version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II.  FACTUAL BACKGROUND

### A.   ADT's Sales Representative Compensation Structure

ADT, a security and fire protection company, hired Hopkins in 2007 as a CORE commercial sales representative with the Birmingham, Alabama office and paid him a base salary and commission.  Docs. 22-1 at 6-7, 12; 22-2 at 18, 21, 23, 39.  As a CORE salesman, Hopkins sold alarm systems, installation services, and upgrades to commercial customers.  Doc. 22-1 at 14.  At the time of his hire, ADT provided its sales representatives generated sales leads within a particular territory,

but also allowed them to self-generate sales leads in other sales representatives' territories or through the Telmar call center clearinghouse. *Id*. at 21. However, eighteen months after it hired Hopkins, ADT announced a new sales compensation plan, the c360 Plan, and set a June 2009 implementation deadline for each office. Doc. 22-3 at 49. The c360 Plan required each ADT office to make seniority based territory assignments and to pay each sales representative a commission from customers serviced within his or her territory. *Id*. If a customer had multiple office locations that spanned multiple territories, the customer could elect to work with a single sales representative. *Id*. In that instance, the sales representative who owned the customer account would receive 75% of the commission, while the sales representative assigned to the territory containing that account would receive the remaining 25%. *Id*.

Although ADT corporate required the adoption of the new system, Birmingham sales manager Spence decided to reject it. Doc. 22-8 at 2-3. Instead, Spence exercised his "managerial discretion" against implementing the provisions of the c360 Plan requiring strict sales territories and commission sharing because he believed implementation would potentially decrease sales. *Id*. Consequently, the Birmingham office continued to use the pre-c360 Plan system of protected accounts and non-protected territories with no commission sharing. *Id*.

4

**B.     First Leave of Absence**

In August 2009, Hopkins suffered a seizure while driving home from work.

Doc. 22-1 at 31.  Since Alabama law apparently revokes driving privileges for six

months following a seizure while driving, Hopkins applied for and received short

term disability and FMLA leave beginning on August 17, 2009.  *Id*. at 32-33; doc.

22-5 at 37-41.  Thereafter, on November 9, 2009, ADT notified Hopkins that he

had exhausted his FMLA leave and that he would not have any job protection if he

remained on leave.  Docs. 22-5 at 42; 22-1 at 33.  However, Hopkins continued on

short term disability until his doctor released him to work on February 10, 2010.

Docs. 22-1 at 33-34; 22-5 at 44.

**C.     Return to Work**

While out on leave, other sales representatives took sales leads within

Hopkins' territory.  Doc. 22-7 at 17.  When Hopkins returned to work, Spence

reassigned Hopkins to his original territory and redirected the new sales leads to

Hopkins.  *Id*.  However, since Spence had decided not to implement the non-

protected accounts or commission sharing policies of the c360 Plan, Spence did not

turn over to Hopkins any accounts sold by other representatives during Hopkins'

absence or give Hopkins a 25% commission from those accounts.  *Id*.  After

Hopkins returned to work, ADT contends that Hopkins failed to meet sales quotas,

5

submit required proposals, or attend sales meetings, which Hopkins attributes to Spence's refusal "to allow [Hopkins] to work [his] full book of business" within the assigned territory.  Doc. 22-1 at 35-37.  In response to an email Spence sent regarding a sales meeting Hopkins missed, Hopkins demanded that Spence turn over all accounts serviced by other representatives in Hopkins' territory.  Doc. 22-5 at 48-49.  Spence, in turn, asked Hopkins to provide "a list of the accounts [Hopkins] had sold in [his] territory that are now being worked by others" so that Spence and Hopkins could "discuss and see if a transition is workable."  *Id*. at 48.  However, it appears that Hopkins failed to comply, claiming that he "did not provide a specific list because he wanted his 'whole book of business,' pre-FMLA leave, restored for his entire territory, not just a few accounts that he could name."  Doc. 25 at 8.

**D.    Demand for c360 Plan Compliance**

In March 2010, Hopkins and Spence met to discuss sales prospects.  Doc. 22-1 at 38.  Hopkins explained in the meeting that he expected the Birmingham office to begin following ADT's new c360 Plan in its entirety, but Spence responded that "we do not do that here, that is not how we do things here."  *Id*. Spence further informed Hopkins that he needed to submit in writing a formal request that the office adhere to the c360 Plan, but that Hopkins' coworkers "would

hate [him] for doing it." *Id*. Thereafter, Hopkins sent Spence the formal request on

and also demanded "complete and open access to [his] account base and territory;"

in other words, that Spence turn over to him all accounts serviced by other

representatives in his territory. *Id*.; doc. 22-6 at 19-20. Spence, in turn, emailed

Hopkins and asked him to provide a list of accounts Hopkins proposed or sold

prior to taking FMLA leave. Docs. 22-1 at 39; 22-6 at 21. Hopkins did not

provide this list, but instead responded that he "cannot list for everyone with which

I met or spoke" and reiterated that he wanted full compliance with the c360 Plan.

Docs. 22-1 at 39; 22-6 at 21.

The following month, Spence met with Hopkins. Doc. 22-1 at 41. Audrey

Courseault, the Southeast Region's Human Resources Manager, also participated in

the meeting by telephone and asked Hopkins for a list of the accounts within his

territory to which he felt entitled. Doc. 22-2 at 11-12. However, Hopkins did not

provide the list because he felt that Courseault could "push the button in the

Compass sales report that spits out that list[.]" *Id*. At some point in the meeting,

Spence told Hopkins "that [he] would be made whole" and again asked Hopkins to

provide "a list of the accounts that [he] wanted to be reinstated to." Doc. 22-1 at

41. Again, Hopkins chose not to provide the list because he wanted the "whole

book of business for that whole territory, not just a few that [he] would name." *Id*.

Instead, after the meeting, Hopkins emailed Courseault and stated that he hoped

they could "come to an understanding" of what exactly Spence meant when he

stated that Hopkins "would be made whole."  Doc. 22-6 at 23.

In May 2010, Hopkins discovered that installations and cancellations were

still occurring inside his territory without his knowledge.  Doc. 22-6 at 31.  As a

result, Hopkins requested that Spence send him "a complete record of all

installations and cancelations [sic] since [his] return from [his] FMLOA on 10

February 2010" and "a complete listing of Telmar and Smart Leads in same

territory from that date."  *Id*.  Spence's response stated

> Per our conversation, I will provide you a listing of jobs sold in your
> territory from February 10th to present.  I have already run the Telmar
> listing you have requested and reviewed it with you.  You indicated the
> two jobs that were sold were very small and should not be reversed.  I
> will provide you with a copy of the Telmar report we discussed.

*Id*. at 32.  Spence then compiled a spreadsheet showing that other representatives

sold twelve accounts within Hopkins' territory while he was on leave. Doc. 25-2 at

2.  Using this spreadsheet and the c360 Plan's commission structure, Spence

estimated that ADT should pay Hopkins $1349.04 in commissions to "make him

whole."  *Id*.; doc. 22-8 at 4.  Spence contends that he attempted to contact Hopkins

several times to discuss the spreadsheet and determine whether Hopkins agreed

with the commission estimate, but Hopkins was unresponsive.  Doc. 22-8 at 4.

In June 2010, Spence issued Hopkins Coaching for Improvement memos for failing to meet sales quotas, attend mandatory meetings, and submit job proposals. Doc. 22-6 at 30, 36.  Spence also emailed Hopkins regarding these deficiencies, and asked Hopkins to "[l]et [him] know if there are any issues." *Id*. at 35.  Hopkins does not recall whether he responded to this email.  Doc. 22-1 at 47.

E.      **Second Leave of Absence and Discharge**

Based on his psychiatrist's recommendation, Hopkins took another leave on June 14, 2010.  Doc. 22-1 at 47.  However, this leave did not qualify under the FMLA since Hopkins had not worked 1,250 hours over the previous twelve months.  Doc. 22-6 at 37.  As a result, ADT informed Hopkins that "[i]f you do not return to work, your absence will be subject to the attendance provisions of company policy or your collective bargaining agreement, as appropriate, and the company may consider you to have voluntarily resigned your job." *Id*.  Finally, ADT added that Hopkins could submit a request for reconsideration within seven days. *Id*.

After Dr. Michael Vaughn released Hopkins to return to work beginning on June 30, 2010, Hopkins obtained another medical work excuse from Brookwood Medical Center extending his leave until July 12, 2010.  Doc. 22-6 at 41-42.  When Hopkins failed to return to work, on July 27, Spence sent Hopkins a letter stating

9

that his absence was not approved, that Spence had attempted to contact Hopkins several times, and that Hopkins failed to apply for an approved short term disability or tender a formal resignation.  Docs. 22-1 at 49; 22-6 at 44.  Accordingly, Spence added that "[i]n accordance with [ADT's] policy on job abandonment (3-days no call/no show)," if Hopkins did not contact ADT by 5:00 p.m. on July 30, ADT would terminate him for job abandonment.  *Id*.  Hopkins never responded and, as such, ADT discharged him for job abandonment.  Docs. 22-2 at 1; 22-8 at 3-4.  Moreover, since Hopkins never responded to Spence's attempts to contact him or return to work, ADT never paid Hopkins the $1349.04 in commissions Spence estimated for Hopkins.  Doc. 22-8 at 4.

### III. ANALYSIS

Hopkins asserts claims for state law breach of contract and fraud, and for FMLA retaliation against ADT and a claim against Spence for fraud. Doc. 1.  The court addresses each claim below.

**A.   State Law Claims**

1.   Common Law Breach of Contract[1]

In Count 1, Hopkins alleges that ADT terminated his employment in breach

---

[1] Hopkins also asserted a statutory breach of contract claim under Ala. Code § 8-24-3 (Count 5), but conceded this claim in response to Defendants' motion for summary judgment. Doc. 25 at 19.  Therefore, Defendants' motion on Count 5 is **GRANTED**.

of his purported October 2007 employment contract. Doc. 1 at ¶¶ 28-33. To establish a contract breach under Alabama law, Hopkins must show "(1) the existence of a valid contract binding the parties in the action, (2) [his] own performance under the contract, (3) [ADT's] nonperformance, and (4) damages." *GE Capital Aviation Services, Inc. v. Pemco World Air Services, Inc.*, 92 So. 3d 749, 763 (Ala. 2012). ADT contends that Hopkins was an at-will employee. Doc. 21 at 15-16. The court agrees.

Hopkins' first assertion, that the employment policies ADT provided him in October 2007 constitute an employment contract, fails because the policies stated unequivocally that they were not employment contracts and that Hopkins' employment status was "at-will." Doc. 22-2 at 18, 21, 23, 39. In fact, Hopkins testified that he knew he was an at-will employee. Doc. 22-1 at 6-7, 12. This admission, coupled with the express terms of the policies, belies Hopkins' contention that an employment contract existed.

Additionally, to the extent Hopkins maintains that Spence's verbal promise to make Hopkins "whole" created a contract, this statement falls short of being sufficient to alter Hopkins' at-will status. To establish such a status change, Hopkins must show "(1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, (2) that the hiring agent had

11

authority to bind the principal to a permanent employment contract, and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered[.]" *Hoffman-LaRoche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987) (internal citations omitted).  As shown below, Hopkins failed to establish any of these three elements.

        a.     *Clear and Unequivocal Offer*

Hopkins cannot rely on Spence's statement to alter his at-will status because the statement was not "a clear and unequivocal offer" and it did not establish "lifetime employment or employment of definite duration."  Just as in *Bates v. Jim Walter Resources, Inc.*, which the Alabama Supreme Court cited in establishing this element, *see Hoffman-LaRoche, Inc*, 512 So. 2d at 728, "it is undisputed that no representations and/or promises whatsoever were made to [Hopkins] regarding the term, duration or length of employment."  418 So. 2d 903, 905 (Ala. 1982).  Spence stated simply that Hopkins "would be made whole," but never indicated what he meant or suggest he intended to guarantee Hopkins employment in perpetuity.  Doc. 22-1 at 41.  In fact, even Hopkins noted that he was uncertain about what the statement meant and never indicated that he interpreted it to mean Spence had changed his status as an at-will employee.  Doc. 22-6 at 23.  Ultimately, even if Spence's statement constituted an offer, it is insufficient to alter

Hopkins' status because even an alleged "oral employment contract that neither includes, nor specifies, any particular term, length, or duration of employment is considered an employment at will contract" that "may be terminated for good cause, bad cause, or no cause at all." *Bates*, 418 So. 2d at 905.

> b.    *Authority to Bind*

Alternatively, Hopkins' reliance on the statement fails because Spence lacked authority to bind ADT to an employment contract.  Alabama law requires actual, rather than implied, authority to bind the principal corporation and establish an employment contract that is not at-will.  *United Sec. Life Ins. Co. v. Gregory*, 201 So. 2d 853, 854 (Ala. 1967).  However, the handbook ADT provided Hopkins states that "[o]nly ADT's President may modify this 'employment-at-will' policy, and for the modification to be effective he/she must do so in writing."  Doc. 22-2 at 39.  Moreover, it is undisputed that Hopkins spoke only to Spence and Courseault regarding Spence's promise to make Hopkins "whole," and that neither Spence nor Courseault are the president of ADT.  *See* docs. 22-1 at 41; 22-6 at 23.  Likewise, Hopkins does not dispute that the alleged modification to his employment contract was not made in writing.  *See id.*  Accordingly, based on ADT's policies, Spence lacked authority to change Hopkins' employment status.

      *c.*   *Substantial Consideration*

Finally, Hopkins' contract claim also fails because he did not provide

"substantial consideration . . . separate from the services to be rendered." *Hoffman-*

*LaRoche, Inc*, 512 So. 2d at 728. Hopkins asserts that his "continued employment

at ADT was consideration under the contract." Doc. 25 at 14. However, Alabama

law requires that Hopkins provide something other than his normal "day to day

services" as an employee of ADT to establish an enforceable contract. *United Sec.*

*Life Ins. Co.*, 201 So. 2d at 855. Hopkins' concession that he did not provide any

consideration beyond "the services to be rendered" is fatal to his breach of contract

claim. Accordingly, ADT's motion on Count 1 is **GRANTED**.

   2.   <u>Fraud</u>

In Count 2, Hopkins asserts a claim for fraud against both ADT and Spence

based upon Spence's alleged failure to make Hopkins "whole" as promised. Doc. 1

at ¶¶ 33-41. Since this claim is "based upon a promise to act or not to act in the

future[,]" it is considered one of promissory fraud and, as such, Hopkins carries a

heavier burden than an ordinary fraud plaintiff. *Ex parte Moulton*, 2013 WL

285726, at *22-23 (Ala. Jan. 25, 2013) (*quoting Ex parte Michelin North America,*

*Inc.*, 795 So. 2d 674, 678 (Ala. 2001)). To prevail, Hopkins must show

  (1) a false representation (2) of a material existing fact (3) reasonably

relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation . . . (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.

*Id*. at * 22.  Defendants assert that Hopkins' claim fails under the first, second, fifth, and sixth elements.  Although determining materiality of an alleged false representation is generally a jury question, the court agrees that Hopkins' claim nevertheless fails under the final two elements of promissory fraud.[2]

a.  *Intent to Not Perform at Time of Representation*

In establishing a claim of promissory fraud, "[f]ailure to perform alone is not sufficient evidence to show a present intent not to perform." *Ex parte Moulton*, 2013 WL 285726 at *23 (*quoting Heisz v. Galt Indus., Inc.*, 93 So. 3d 918, 925 (Ala. 2012)).  However, Hopkins failed to produce any evidence beyond Spence's failure to pay him the 25% commissions to suggest that Spence had no intention to honor his promise to make Hopkins "whole."  In fact, the evidence supports a contrary conclusion.  Specifically, despite Hopkins' refusal to provide Spence or Courseault the requested lists of accounts within his territory, Spence himself generated a list of accounts sold by other representatives in Hopkins' territory

---

[2] The court also notes that Hopkins only addressed the first and second elements in his response to Defendants' motion and thus appears to concede that his claim fails under the intent to not perform and intent to deceive elements.  *See* doc. 25 at 15-16.

during his leave and calculated commissions based on the list.  Docs. 22-1 at 41; 25-2 at 2; 22-8 at 4.  Thereafter, when Spence attempted to reach Hopkins to discuss this list and the commission estimate, Hopkins never responded.  Doc. 22-8 at 4.  These facts belie any contention that Spence never intended to honor his promise and, in fact, establish that Hopkins' failure to return to work or respond to Spence's calls thwarted Spence's actions.  Accordingly, Hopkins failed to establish an intent not to perform.

### b.   Intent to Deceive

Likewise, Hopkins failed to establish an intent to deceive.  "A defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made."  *Byrd v. Lamar*, 846 So. 2d 334, 343 (Ala. 2002).  Hopkins failed to present *any* evidence suggesting that Spence intended to deceive him.  In contrast, the evidence shows that Spence intended to keep his promise and, despite Hopkins' failure to cooperate, took steps toward fulfilling it.  Docs. 22-1 at 41; 25-2 at 2; 22-8 at 4.

In short, Hopkins failed to establish a necessary element of his claim for promissory fraud.  Accordingly, Defendants' motion on Count 2 is **GRANTED**.

**B.     FMLA Retaliation**[3]

In Count 4, Hopkins alleges that ADT retaliated against him for exercising his right to FMLA benefits by refusing to return his old accounts to him and later terminating him.  Doc. 1 at ¶¶ 45-47.  "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001).  Where, as here, there is no direct evidence of discriminatory intent, the court employs the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Accordingly, the plaintiff must first establish a prima facie case of discrimination by showing that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity."  *Strickland*, 239 F.3d at 1207.  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Martin v. Brevard Cnty. Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008).  If the defendant carries this burden, the plaintiff must show that this reason

---

[3] Hopkins also alleged an interference claim under the FMLA (Count 3), but conceded this claim in his response to Defendants' motion for summary judgment.  Doc. 25 at 16.  Therefore, Defendants' motion on Count 3 is **GRANTED**.

is mere pretext for discrimination in order to succeed on his claim. *Id*. "To show

pretext, a plaintiff must come forward with evidence . . . sufficient to permit a

reasonable factfinder to conclude that the reasons given by the employer were not

the real reasons for the adverse employment decision." *Hurlbert v. St.Mary's*

*Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotation

marks and citation omitted).

    1.    <u>Failure to Return Accounts</u>

      Again, Hopkins raises two bases of alleged retaliation.  First, Hopkins claims

ADT failed to turn over to him all the accounts within his territory after he returned

from FMLA leave.  While Hopkins is correct that ADT did not turn over to him

accounts other representatives sold in his territory during his leave, unfortunately

for Hopkins, he cannot establish that this decision was causally related to his leave.

In a nutshell, Hopkins wanted his supervisor to implement a system that would, in

part, compensate him for sales generated during his medical leave.  However, the

FMLA does not mandate that employers pay employees for their leave.  29 U.S.C.

§ 2612(c).  Moreover, based on the evidence, ADT did not have protected

territories when it hired Hopkins in 2007.  Doc. 22-1 at 21.  Although ADT

implemented a new sales plan in 2009 that provided for seniority based territories

for new sales leads, the new policy still allowed representatives to service accounts

within another representative's territory under a shared commission system.  Doc. 22-3 at 49.  However, it is undisputed that prior to Hopkins' FMLA leave, his supervisor, Spence, opted against implementing this new sales plan.  Spence's decision meant sales representatives in his office, including Hopkins, could still generate new sales leads outside their designated territories without sharing commissions with the sales representative assigned to the territory.  Doc. 22-8 at 2-3.  They did so before, during, and after Hopkins' leave.  Thus, to the extent that Hopkins claims Spence and/or ADT retaliated against him by allowing other employees to sell in his assigned territory during or after his leave or by not giving him a share of the commissions, his claim fails.

Furthermore, although other sales representatives necessarily serviced Hopkins' territory while he was on leave, Spence reassigned Hopkins to his old territory and redirected all new sales leads to Hopkins when Hopkins returned. Doc. 22-7 at 17.  However, based on Spence's decision prior to Hopkins' leave not to share commissions, other representatives continued to service the sales leads they previously generated in Hopkins' territory and did not share the commissions. *Id*.  While it is unclear whether the c360 Plan would have required Spence to turn over the previously generated sales leads to Hopkins upon his return, the evidence shows that Spence's failure to do so, or to immediately provide Hopkins with the

19

25% commissions, was based on his decision not to follow the c360 Plan rather than retaliatory animus.  Since Spence made this decision prior to Hopkins' FMLA leave, Hopkins simply cannot establish a causal relationship between Spence's decision and his protected activity. *Strickland*, 239 F.3d at 1207.  Therefore, Hopkins' prima facie case for his retaliation claim based on the failure to turn over all the accounts to Hopkins or to give him commissions for accounts other representatives sold in his territory fails.

Alternatively, the claim fails because Hopkins failed to rebut ADT's contention that it did not turn over to Hopkins all the accounts within his territory after he returned from FMLA leave because of Spence's prior decision not to follow the c360 Plan.  Doc. 21 at 29-30.  In fact, Hopkins does not raise any evidence of pretext or dispute that Spence never instituted the c360 Plan.  Instead, Hopkins asserts only that Spence's "decision is irrelevant because . . . [i]f [Hopkins] had not taken FMLA leave, other sales representatives would not have serviced his accounts while he was gone, and he would have continued to enjoy the territory he had been happy with before his FMLA leave."  Doc. 25 at 19.  Unfortunately for Hopkins, this argument misses the mark.  While it is true that Hopkins would have had an opportunity to generate sales leads within his territory if he had not taken FMLA leave, it is unreasonable to expect ADT to simply cease

20

servicing accounts or generating new sales within Hopkins' territory during Hopkins' extended leave.  Moreover, since Spence decided not to follow the c360 Plan, it is clear that he would have allowed other sales representatives to generate new sales leads and service accounts within Hopkins' territory even if Hopkins had not taken leave.  Docs. 22-8 at 2-3; 22-7 at 17.  Accordingly, Hopkins failed to present any evidence showing that ADT's articulated reason for not turning over all the accounts in his assigned territory is pretext for retaliation.

Ultimately, Hopkins' retaliation claim fails because he failed to establish that Spence's decision to reject the c360 Plan was specifically related to his leave. While Hopkins may think it is unfair that other representatives generated sales inside his territory and continued to profit from those accounts after Hopkins returned from leave, there is nothing retaliatory about this practice since it was consistent with Spence's prior decision to reject the c360 Plan.  Significantly, under Spence's policy, Hopkins also had the freedom to generate sales in other representatives' territories and to receive full commission for those sales.  In the final analysis, whether Hopkins is correct that Spence should have adopted the c360 Plan in its entirety, doc. 25 at 5, is not for this court to decide.  It is axiomatic that courts "do not sit as a super-personnel department that reexamines an entity's business decisions" and that " no matter how mistaken the firm's managers, the

21

[court] does not interfere." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  Rather, this court is tasked solely with ascertaining whether the plaintiff has established discriminatory conduct and "whether the employer gave an honest explanation of its behavior." *Id*.  Based on the evidence before this court, Hopkins failed to meet his burden.  Therefore, ADT's motion on this claim is **GRANTED**.

    2.    <u>Discharge</u>

Likewise, Hopkins cannot establish causation with respect to his second contention that ADT discharged him in retaliation of his FMLA leave or that ADT's reasons for his discharge are pretextual. While close temporal proximity may create an inference of causation, *Strickland*, 239 F.3d at 1207, here, the protected activity, i.e. the FMLA leave Hopkins took on August 17, 2009, occurred ten months before ADT discharged Hopkins and six months after Hopkins returned from his leave.  Docs. 22-1 at 32-34; 22-2 at 1; 22-5 at 37-42, 44; 22-8 at 3-4. Since the Eleventh Circuit has "held that, in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation[,]" *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006), the court finds that the six to ten month proximity here is likewise insufficient to alone establish causation.

Therefore, Hopkins' prima facie case fails.

Alternatively, the retaliatory discharge claim fails because ADT articulated a legitimate non-retaliatory reason for the discharge – job abandonment.  Doc. 21 at 30-31.  Hopkins failed to address this contention or raise any evidence of pretext. *See* doc. 25.  Moreover, the evidence supports ADT's contention.  Hopkins worked at ADT for nearly six months after returning from his FMLA leave.  Doc. 22-6 at 30, 36.  After taking a leave for personal reasons on June 14, 2010, Hopkins was released to return to work on July 12, 2010, but admittedly never returned to work. Docs. 22-6 at 37, 41-42; 22-1 at 47, 49.  Thereafter, Spence sent Hopkins a letter explaining that Hopkins' leave was unapproved and that if he did not return or make contact with Spence by July 30th, ADT would discharge  Hopkins for job abandonment.  Doc. 22-6 at 44.  For reasons only Hopkins knows, he failed to return or contact Spence. Docs. 22-1 at 1; 22-8 at 3-4.  In other words, the evidence indisputably supports ADT's contention that it discharged Hopkins for job abandonment.  Accordingly, ADT's motion on the retaliatory discharge claim is **GRANTED**.

## IV.  CONCLUSION

In sum, Defendants' motion for summary judgment is **GRANTED**. Accordingly, Hopkins' claims are **DISMISSED with prejudice**.

**DONE** this 8th day of May, 2013.

---
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE